IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JANNA DEWITT,

              Plaintiff,

      v.                                 Case No. 12-2605-SAC

SOUTHWESTERN BELL
TELEPHONE COMPANY,

              Defendant.

MEMORANDUM AND ORDER

This employment practices case comes before the Court on Defendant's motion for summary judgment. Plaintiff brings the following claims against Defendant: terminating her employment on the basis of her disability in violation of the ADA; failing to reasonably accommodate her in violation of the ADA; and terminating her in retaliation for her use of leave in violation of the FMLA. Dk. 72, p. 7.

**I. Summary Judgment Standard**

On summary judgment, the initial burden is with the movant to point out the portions of the record which show that the movant is entitled to judgment as a matter of law. *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied*, 506 U.S. 1013 (1992). If this burden is met, the non-movant must set forth specific facts which would be admissible as evidence from which a rational fact finder could find in the non-movant's favor. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th

Cir. 1998). The non-movant must show more than some "metaphysical doubt" based on "evidence" and not "speculation, conjecture or surmise." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bones v. Honeywell Intern.*, 366 F.3d 869, 875 (10th Cir. 2004). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether the evidence is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986).

In applying this standard, all inferences arising from the record must be drawn in favor of the nonmovant. *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003). Credibility determinations and the weighing of the evidence are jury functions, not those of a judge. *Id.* at 1216. Nevertheless, "the nonmovant must establish, at a minimum, 'an inference of the existence of each element essential to [her] case.' " *Croy v. COBE Laboratories, Inc.*, 345 F.3d 1199, 1201 (10th Cir. 2003) (quoting *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)).

## II. Facts

The Court sets forth the relevant and admissible facts, construed in the light most favorable to the Plaintiff, below. Additional facts are set forth in the Court's analysis of the arguments. The Court notes that both parties have improperly attempted to controvert uncontroverted facts by arguing

2

that various inferences that may arise from an uncontroverted fact are misleading, immaterial, or incomplete.

Defendant hired Plaintiff on April 21, 1997 to work as a customer service representative. An essential function of her job was answering calls from customers. From time to time, Defendant's supervisors reviewed calls handled by customer service representatives. Plaintiff has Type I diabetes, is insulin dependent, and has used an insulin pump since 2008. She monitors her glucose level numerous times throughout the day.

**Cramming Incident**

During her employment, Plaintiff reviewed Defendant's Code of Business Conduct Policy, in addition to other documents. That Code stated that Defendant will "earn and preserve [the customers'] trust by treating them with honesty and integrity, and in a professional, courteous manner. [Defendant] does not provide goods or services that customers did not authorize." Dk. 76, Exh. 5. It additionally stated, "[e]ach employee is responsible for being familiar with the information in this Code, and for following the Code, and the Company's policies and guidelines. We understand that violation may result in discipline, up to and including termination of employment." *Id.*

Plaintiff understood "cramming" to be when a customer service representative deliberately adds services to a customer's account without telling the customer about it. Plaintiff understood that "cramming" would be

a violation of the Code of Business Conduct principles, warranting serious consequences.

On January 21, 2010, Plaintiff failed to delete a service plan from a customer's account after that customer declined the service. Plaintiff had added the service to the customer's account because that was the only way for Plaintiff to determine the cost of the service. After Plaintiff told the customer the cost, the customer declined the service but Plaintiff forgot to remove the unwanted service from the account. Tom Heumann, Plaintiff's immediate supervisor, detected this error while reviewing Plaintiff's calls and Plaintiff was suspended the next day.

Plaintiff had a "Day In Court" meeting on January 29, 2010, regarding this incident, so had an opportunity to state her side of the story to the person who would make a final decision on what discipline to impose. Plaintiff's meeting was conducted by the General Manager of the Consumer Call Centers, Kimberly Baskett-McEnany. Plaintiff did not dispute that she had added a service to a customer's account without the customer's approval which she should not have done, but claimed her act was unintentional.

After the meeting, Baskett-McEnany and her management team decided to offer Plaintiff a "Last Chance Agreement." In that agreement, Plaintiff agreed that Defendant had just cause to terminate her employment

and that any discipline she had already received was based on just cause.

She further agreed

> ... that I will maintain satisfactory performance in all components of my job, including measurement, safety, attendance/punctuality, use of company resources, company policies, and conduct. Through this Agreement I acknowledge and understand that even one incident of failing to maintain satisfactory performance in all components of my job . . . may lead to further disciplinary action including dismissal.

Dk. 76, Exh. 9. Plaintiff signed the Last Chance Agreement on February 1, 2010, having been told by Defendant that if she did not sign it she would be terminated.

**FMLA Leave**

Throughout her employment, Plaintiff took FMLA leave for medical conditions, including those related to her diabetes. She took FMLA leave only if she had no vacation leave available. Defendant never denied any of Plaintiff's requests for FMLA leave, but sometimes requested additional information.

Before March 3, 2010, Defendant had always provided whatever accommodations Plaintiff needed for her medical condition. Defendant permitted Plaintiff to keep candy, juice, and other items at her desk to use in case of a blood sugar event, and permitted her extra breaks to check her blood sugar levels and to address any blood sugar issues.

**Hang-Ups[1]**

Hanging up on customers before a call is completed is a violation of Defendant's Code of Business Conduct and is considered a customer "mistreat." Plaintiff understood it was improper for a customer service representative to hang up on a customer call before it was completed because that could make the customer mad and make a negative impression of Defendant, jeopardizing the company's reputation. To hang up on a customer, a customer service representative must first click the "Release" button on a toolbar at the top of the screen, then click "yes" to the pop up question that appears in the middle of the screen.

On March 3, 2010, Plaintiff hung upon at least two customers. She alleges that she unknowingly disconnected the calls during an episode of extremely low blood sugar, and did not disconnect them intentionally. Plaintiff recalls that she "felt off" earlier in the afternoon, so drank pineapple juice to try to stabilize her blood sugar. At one point her blood sugar dropped and she began trembling. She ate dried fruit, and drank Dr. Pepper. She has no recollection of having received calls from two or more customers, then disconnecting them without speaking to them. After those hang ups, Plaintiff recalls being locked out of her computer and contacting supervisor Heumann to help reset it.

---

[1] For purposes of convenience, the Court uses the term "hung up" to indicate a premature disconnection, without indicating that the act was deliberate or intentional.

Heumann discovered the hang-ups later that day when reviewing Plaintiff's calls. Later that day, Plaintiff participated in a suspension meeting with Heumann, Beth Kloxin (a "manager" of some kind), and Mary Tormey, the Union Steward. During the meeting, participants reviewed two hang-up calls for which they had "screenshots." Those calls had occurred at 3:53 p.m. and 3:54 p.m. Plaintiff was suspended without pay, and realized that she was probably going to be fired.

Immediately after that meeting, Plaintiff's union steward asked to see her insulin pump monitor and recorded Plaintiff's blood glucose levels for that day from the monitor: 46 at 3:15 p.m., 85 at 4:01 p.m., 44 at 4:32 p.m., and 34 at 4:37 p.m.[2] Plaintiff's normal blood sugar level is between 60 and 120.

Thereafter, Baskett-McEnany reviewed the suspension meeting minutes and discussed with Rivera (a second-line supervisor) and Kloxin that the screenshots video indicated that Plaintiff seemed to have capable control over the system.

On March 10, 2010, Baskett-McEnany held a Day In Court meeting at which Plaintiff was allowed to state her position regarding the dropped calls.,

---

[2] Plaintiff states that a medical record shows her blood glucose level of 34 that day was at 5:07 p.m., not 4:37 p.m. (Dk. 83, Exh. G, p. 2.) But the record itself is illegible. Plaintiff avers, without explanation, that the times stated on the medical record are one hour later than the actual time, so believes her level of 34 occurred at 4:07 p.m. But Plaintiff neither offers any basis of knowledge for that assertion, nor any explanation for why the stated time is 30 minutes later than the time recorded above (4:37) from Plaintiff's insulin pump monitor. Accordingly, the Court sustains Defendant's objection to this testimony regarding this exhibit as inadmissible for lack of foundation.

Plaintiff stated that the hang ups were caused by her diabetes, that they were not done intentionally, that she had no recollection of the three-to-five minute period during which she had disconnected the calls, and that her computer had locked up. Plaintiff does not allege that she presented either the insulin pump monitor blood sugar readings or the medical record showing her blood sugar readings for March 3rd.

After that meeting, Baskett-McEnany, in consultation with Rivera, made the decision to terminate Plaintiff's employment because she knew Plaintiff was on a Last Chance Agreement and had mistreated customers. She believed Plaintiff had purposefully hung-up on multiple customers and that this misconduct was not caused by her disability. Defendant terminated Plaintiff's employment effective March 15, 2010, notifying her that she was terminated for releasing two calls, a customer mistreat and Code of Business Conduct violation, and for her violation of the Last Chance Agreement.

## III. Analysis

### A. ADA Termination

To establish a prima facie case of employment discrimination under the ADA, Plaintiff must present evidence that (1) she is disabled within the meaning of the ADA; (2) she is qualified to perform the essential functions of his job with or without accommodations; and (3) she was terminated under circumstances which give rise to an inference that the termination was based

on her disability. *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 544 (10th Cir. 2014).

Even assuming, *arguendo,* that Plaintiff can prove the first two elements of a prima facie claim, her ADA claim fails as a matter of law because she cannot establish that her termination was based on her alleged disability. To establish this latter element, an employee must show a nexus, or "at least a logical connection" between his disability and the termination. *See Greene v. Safeway Stores, Inc.,* 98 F.3d 554, 558 (10th Cir. 1996).

> "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). But if the employer articulates "a legitimate nondiscriminatory reason for the action … [, the employee] must show [the employer's] proffered reasons are pretextual." *Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 531 (10th Cir. 1998). When evaluating evidence of pretext, "we examine the facts as they appear to the person making the decision to terminate [Appellant]." *Selenke,* 248 F.3d at 1261 (internal quotations and citations omitted).

*Tesh v. U.S. Postal Service,* 349 F.3d 1270, 1272 (10th Cir. 2003).

Plaintiff attempts to meet this burden by presenting circumstantial evidence of discrimination, requiring application of the familiar *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Carter v. Pathfinder Energy Servs., Inc.,* 662 F.3d 1134, 1141 (10th Cir. 2011). Thus, the plaintiff must first submit evidence from which a reasonable jury could conclude that a prima facie case of discrimination has been established. The defendant must then offer sufficient evidence of a legitimate,

nondiscriminatory reason for its action. Carter, 662 F.3d at 1141. If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext designed to mask discrimination. *Id.* Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Id.*

Defendant's burden to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination is not onerous. *See Anaeme v. Diagnostek, Inc.,* 164 F.3d 1275, 1279 (10th Cir. 1999) (recognizing employer's burden is "exceedingly light"), *cert. denied,* 528 U.S. 814 (1999). Defendant has met this burden by providing evidence that Plaintiff mistreated customers by disconnecting two or more customer calls on March 10th, when subject to a Last Chance Agreement in which both parties agreed that "even one incident of failing to maintain satisfactory performance in all components of [her] job . . . may lead to further disciplinary action including dismissal." Plaintiff essentially contends that her acts were done while she was experiencing hypoglycemic unawareness syndrome – a direct result of her diabetes - thus Defendant erred in finding she acted intentionally. But the Court's task is not to "ask whether the employer's decision was 'wise, fair or correct, but whether [it] honestly believed [the legitimate, nondiscriminatory] reasons [it gave for its conduct]

and acted in good faith on those beliefs.' " *Johnson v. Weld Cnty., Colo.,* 594 F.3d 1202, 1211 (10th Cir. 2010) (quoting *Rivera v. City & Cnty. of Denver,* 365 F.3d 912, 925 (10th Cir. 2004)).

Plaintiff must thus show evidence from which a reasonable jury could conclude that the defendant's proffered non-discriminatory reason for its action is a pretext for intentional discrimination based on her disability. *See Texas Dept. of Community. Affairs v. Burdine,* 450 U.S. 248, 255 & n. 10, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Swackhammer v. Sprint/United Management Co.,* 493 F.3d 1160, 1163 (10th Cir. 2007) (Plaintiffs must come forward with "evidence … sufficient to permit an inference that the true explanation … was intentional discrimination."); *Miller v. Eby Realty Group LLC,* 396 F.3d 1105, 1111 (10th Cir. 2005) ("[T]he factfinder must be able to conclude, based on a preponderance of the evidence, that discrimination was a determinative factor in the employer's actions-simply disbelieving the employer is insufficient.")

Pretext may be shown in a variety of ways, "including but not limited to differential treatment of similarly situated employees and procedural irregularities." *Trujillo v. PacifiCorp,* 524 F.3d 1149, 1158 (10th Cir. 2008). *See Danville v. Regional Lab Corp.,* 292 F.3d 1246, 1250 (10th Cir. 2002). Typically, a plaintiff attempts to demonstrate pretext in one or more of three ways:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false, (2) with evidence that the defendant

> acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances, or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff."

*Kendrick v. Penske Transportation Services,* 220 F.3d 1220, 1230 (10th Cir. 2000) (internal citations omitted). Here, Plaintiff shows none of the above. Instead, she relies on her own subjective beliefs, and negative statements and acts by persons who did not participate in the decision to terminate her employment.

First, Plaintiff states her belief that the job performance of employees who used FMLA leave was watched more closely in order to find reasons to get rid of them, and Plaintiff did not want to be "one of those FMLA people" or be on the "naughty list" for taking FMLA leave, so used her vacation time first. But these speculations are conclusory, and are unsupported by citation to any record or any basis in fact, and have no connection to the belief of the decision-makers.

Secondly, Plaintiff relies on an affidavit by Manager Suzanne Garcia, who left Defendant's employment in 2008. She avers: "customer service representatives that used FMLA leave negatively impacted the sales quotas of the sales manager"; "as a manager, [she] attended meetings and heard discussions regarding employees who used FMLA leave"; "some employees using FMLA leave were targeted as employees that [Defendant] wanted to terminate and looked for other reasons to terminate that employee"; "Beth

Kloxin was one of the managers who discussed terminating employees using FMLA leave"; "at a meeting in Dallas, Texas, a company executive indicated that employees who used FMLA leave should go to work for 'one of our competitors'"; and [Plaintiff] was on the 'target list' as an employee who used FMLA leave and should be fired if possible for other reasons.

But it was Baskett-McEnany, in consultation with Rivera, who made the decision to terminate Plaintiff's employment. To show pretext, the plaintiff must a demonstrate a nexus between the allegedly discriminatory statements and the defendant's decision to terminate her. *Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1457 (10th Cir. 1994). No evidence suggests that Baskett-McEnany or Rivera was present at any of the meetings Garcia attended, that either of them heard, made or agreed with any of the statements noted in Garcia's affidavit, or that either of them was aware of any "target list." Nor does Plaintiff raise any cat's paw theory. *See Macon v. United Parcel Service, Inc.*, 743 F.3d 708 (10th Cir. 2014) (explaining when an employer can be liable for a biased supervisor's acts even if the final discipline is imposed by a seemingly neutral higher authority). Accordingly, the general anti-FMLA statements noted by Garcia fail to raise any inference of a pretextual termination decision. *Cf. Jones v. Unisys Corp.,* 54 F.3d 624, 632 (10th Cir. 1995) ("This stray [double-hearsay] remark by someone not in a decision-making position does not establish intent to discriminate."); *Conroy v. Vilsack* ,707 F.3d 1163, 1184-1185 (10th Cir. 2013).

Lastly, Plaintiff points to animus by Manager Kloxin.[3] Rivera testified that

> [w]hen Kloxin found out that DeWitt had disconnected the customer calls, Kloxin was "doing a dance in the back [of the office] and told [Rivera], 'I finally got that bitch.'" When Rivera told her this behavior was not appropriate, she responded, "You don't understand. I've been chasing after her long before, since you got here." She proceeded to explain to him that DeWitt has "continued attendance issues" and she did a little dance.

Dk. 83, p. 16.

But Kloxin was not a decision-maker in Plaintiff's termination, and the record fails to show that Baskett-McEnany had any knowledge of Kloxin's actions or that she or Rivera shared Kloxin's motive or sentiments. To the contrary, Rivera told Kloxin her behavior was inappropriate, and Plaintiff alleges that Rivera recommended that she *not* be terminated and did not believe her hang-ups were intentional. Dk. 83, p. 17. Nothing in these facts gives rise to an inference that defendant's stated reason of job misconduct is a pretext for intentional discrimination on the basis of Plaintiff's diabetes. *See Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323-24 (10th Cir. 1997).

The record, viewed in the light most favorable to the Plaintiff, fails to disclose a genuine issue of material fact regarding pretext. Summary judgment is thus appropriate on this termination claim.

---

[3] The record notes that Kloxin is a "manager," but fails to reveal her job title or duties. She does not, however, appear to be in the line of direct supervision for the Plaintiff and did not participate in the decision to terminate the Plaintiff.

**B. ADA Failure to Accommodate**

To establish a prima facie case of failure to accommodate under the ADA, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability. *Allen v. SouthCrest Hosp.*, 455 Fed.Appx. 827, 830, 2011 WL 6394472, 3 n. 2 (10th Cir. 2011).

For purposes of this discussion, the Court assumes, *arguendo*, that the first two elements above are met, and focuses solely on whether Defendant failed to reasonably accommodate Plaintiff's diabetes. Under the ADA, an employer discriminates against a qualified individual with a disability if the employer does not

> mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer]. 42 U.S.C. § 12112(b)(5)(A).

*Roberts v. Cessna Aircraft Co.*, 289 Fed.Appx. 321, 326, 2008 WL 3524009, 4 (10th Cir. 2008). *See* 42 U.S.C.A. § 12111 (defining the term "reasonable accommodation").

The only accommodation Plaintiff suggests is retroactive - to excuse or overlook her misconduct or reduce her discipline, since her conduct was related to her disability. This suggested accommodation is untimely and unreasonable, so is not required by the ADA. As the Tenth Circuit found in

*Davila v. Quest Corp.,* 113 Fed. Appx. 849, 854 (10th Cir. 2004), "excusing

workplace misconduct to provide a fresh start/second chance to an

employee whose disability could be offered as an after-the-fact excuse is not

a required accommodation under the ADA."

>       In essence, plaintiff's position is that when defendant learned his
> workplace violence was evidently rooted in a bipolar condition,
> defendant was required to retroactively excuse any misconduct related
> to that condition. But, as many cases have recognized in various
> contexts, excusing workplace misconduct to provide a fresh
> start/second chance to an employee whose disability could be offered
> as an after-the-fact excuse is not a required accommodation under the
> ADA. *See, e.g., Hill v. Kan. City Area Transp. Auth.,* 181 F.3d 891, 894
> (8th Cir.1999); *Burch v. Coca-Cola Co.,* 119 F.3d 305, 320 n. 14 (5th
> Cir. 1997) (following *Siefken v. Vill. of Arlington Heights,* 65 F.3d 664,
> 666 (7th Cir. 1995)); *Office of Senate Sergeant at Arms v. Office of
> Senate Fair Employment Practices,* 95 F.3d 1102, 1107-08 (Fed.Cir.
> 1996); *Green v. George L. Smith II Ga. World Congress Ctr. Auth.,*
> 987 F.Supp. 1481, 1484-85 (N.D.Ga. 1997). As the EEOC's
> Enforcement Guidance succinctly states, " '[s]ince reasonable
> accommodation is always prospective, an employer is not required to
> excuse past misconduct even if it is the result of the individual's
> disability.' " *Brookins v. Indianapolis Power & Light Co.,* 90 F.Supp.2d
> 993, 1007 (S.D.Ind.2000) (quoting U.S. Equal Opportunity
> Employment Comm'n, *Enforcement Guidance: Reasonable
> Accommodation and Undue Hardship Under the Americans with
> Disabilities Act* at 24).
>       In sum, neither the immediate ground for plaintiff's termination,
> nor the antecedent disciplinary violation placing him in an employment
> status vulnerable to termination, implicate ADA protections. We
> conclude that plaintiff's ADA claim must fail as a matter of law.

*Davila,* 113 Fed.Appx. at 854. *See* EEOC, *Enforcement Guidance:*

*Reasonable Accommodation and Undue Hardship Under the ADA,* No. 35,

2002 WL 31994335, 24-26 ("An employer never has to excuse a violation of

a uniformly applied conduct rule that is job-related and consistent with

business necessity."); *Id,* No. 36 ("Since reasonable accommodation is

always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability.").

Although the Tenth Circuit has no published decision on this issue, this court is persuaded by *Davila* and by other Circuit courts which have consistently explained that a 'second chance' or overlooking misconduct that otherwise warrants termination is not a "reasonable accommodation." See *e.g.*, *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 465 (4th Cir. 2012) ("[T]he law does not require [defendant] to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability."); *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 90 (1st Cir. 2012) ("When an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be 'too little, too late.' "); *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 366 (6th Cir. 2007) (assuming that verbal outbursts stated to be the reason for her termination were symptomatic behaviors of her disability, yet finding" [T]his court has repeatedly stated that an employer may legitimately fire an employee for conduct, even conduct that occurs as a result of a disability, if that conduct disqualifies the employee from his or her job.") *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315–16 (6th Cir. 2012) (en banc); *Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1052 (5th Cir. 1998) ("[T]he ADA does not insulate emotional or violent outbursts blamed on an

17

impairment.... [Plaintiff] cannot hide behind the ADA and avoid accountability for his actions."); *Palmer v. Circuit Court of Cook Cnty., Ill.,* 117 F.3d 351, 352 (7th Cir. 1997) ("[I]f an employer fires an employee because of the employee's unacceptable behavior, the fact that that behavior was precipitated by a mental illness does not present an issue under the Americans with Disabilities Act."). The ADA does not require an employer to excuse an employee's previous misconduct, even if it was precipitated by her disability.

Nor was Defendant required to allow Plaintiff an opportunity to alter her diabetes monitoring technique prior to terminating her. *See Hill v. Kansas City Area Transp. Auth.,* 181 F.3d 891, 894 (8th Cir. 1999) (finding this accommodation unreasonable; upholding termination of police officer who was fired after he suffered a severe diabetic reaction that caused him to lose control over his squad car); *Siefken v. Village of Arlington Heights,* 65 F.3d 664, 666 (7th Cir. 1995) (explaining that a workplace adjustment exclusively within the employee's control is not an accommodation within the meaning of the ADA). Accordingly, summary judgment in favor of Defendant is warranted on this failure to accommodate claim.

### C. FMLA Retaliatory Termination

Plaintiff's final claim is that Defendant terminated her employment in retaliation for her prior use of FMLA leave.

FMLA claims under a theory of retaliation are subject to the burden-shifting analysis of *McDonnell Douglas. Metzler,* 464 F.3d at

1170 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). A prima facie case of retaliation requires a showing that (1) the employee engaged in a protected activity, (2) the employer took an action that a reasonable employee would have found materially adverse, and (3) there is a causal connection between the protected activity and the adverse action. *Id.* at 1171. Once a plaintiff establishes the prima facie case, the burden shifts to the employer to demonstrate a legitimate, nonretaliatory reason for termination. *Id.* at 1172. Finally, in order to avoid summary judgment, the employee must show that there is a genuine dispute of material fact as to whether the employer's reasons for termination are pretextual. *Id.*

*Brown v. ScriptPro*, 700 F.3d 1222, 1229 (10th Cir. 2012).

Here, as above, the Court assumes, arguendo, that Plaintiff meets the first two elements, so focuses on the requisite causal connection. The parties agree that Plaintiff took FMLA leave in 2009 and "early 2010." Oddly, the parties fails to establish the dates of such leave.

A retaliatory motive may be inferred when an adverse action closely follows protected activity. *Chavez v. City of Arvada,* 88 F.3d 861, 866 (10th Cir. 1996). However, unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation. *Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir. 1997) (emphasis added). *Compare Ramirez v. Oklahoma Dept. of Mental Health,* 41 F.3d 584, 596 (10th Cir. 1994) (one and one-half month period between protected activity and adverse action may, by itself, establish causation) *with Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir. 1997) (three-month period, standing alone, is insufficient to establish causation). The parties appear to

assume that because Plaintiff's terminable offenses occurred in January and March of 2010, the requisite causal connection would ordinarily be established by mere temporal proximity. The Court lacks sufficient facts to decide this issue so accepts this concession.

Defendant points to the intervening event of the disconnected calls to dispel any inference of a causal nexus. The Tenth Circuit has held that "... evidence of intervening events, tend[s] to undermine any inference of retaliatory motive and weaken the causal link." *Maestas v. Segura,* 416 F.3d 1182, 1189 (10th Cir. 2005). *See Cypert v. Independent School Dist. No. I-050 of Osage County,* 661 F.3d 477, 484 (10th Cir. 2011); *Couch v. Board of Trustees of Memorial Hosp. of Carbon County*, 587 F.3d 1223, 1237 (10th Cir. 2009).

> .. we have recognized that evidence of temporal proximity has minimal probative value in a retaliation case where intervening events between the employee's protected conduct and the challenged employment action provide a legitimate basis for the employer's action. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.,* 452 F.3d 1193, 1203 (10th Cir. 2006); *cf. Maestas v. Segura,* 416 F.3d 1182, 1189 (10th Cir. 2005) (observing, in the context of First Amendment retaliation, that "evidence of intervening events tend[s] to undermine any interference of retaliatory motive and weaken the causal link" (citation omitted)).

*Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1001-1002 (10th Cir. 2011) (finding unreported absences after plaintiff's complaint about discrimination constituted intervening events that undermined her temporal-proximity argument).

A temporal nexus may actually cut *against* a finding of pretext where an employer acts in response to specific and continuing disciplinary problems.

> The timing argument is undermined, however, by the fact that Mr. Argo arrived late for work on January 29, and once again failed to work on "old leads" as directed. Mr. Argo was fired the next morning, January 30. These intervening events defeat any inference of retaliation because the company's concerns about tardiness and "attitude" obviously predate Mr. Argo's internal complaint. Ms. Oliva's January 2 "Performance" memorandum issued a "*last* warning" for "tardiness, time utilization, [and] not following directives," and specifically threatened termination for future infractions. *Id.* at 138. Thus, the timing of the termination actually cuts against a finding of pretext by strongly suggesting that Blue Cross Blue Shield acted in response to specific and continuing disciplinary problems.

*Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006) (finding that no reasonable jury could conclude that Argo's termination was retaliatory).

Even assuming a causal connection sufficient to establish a prima facie case, the Court finds, for the same reasons discussed above in analyzing Plaintiff's ADA discrimination claim, that Defendant has shown a legitimate, nonretaliatory reason for Plaintiff's termination, and Plaintiff has not raised a triable issue of pretext for purposes of this FMLA retaliation claim.

IT IS THEREFORE ORDERED that Defendant's motion for summary judgment (Dk. 75) is granted.

Dated this 13th  day of August, 2014, at Topeka, Kansas.


s/Sam A. Crow                                      
Sam A. Crow, U.S. District Senior Judge